1

AO 91 (REV.5/85) Criminal Complaint

AUSA Brian Netols, (312) 353-4128

UNITED STATES DISTRICT COURT

NORTHERN _____ DISTRICT OF ___ ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

**RECEIVED**

v.

CRIMINAL COMPLAINT

JEROME FINNIGAN

SEP 2 5 2007

CASE NUMBER: 07 CR 634

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MAGISTRATE JUDGE COLE

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my

knowledge and belief. On or about   September 18, 21 and 23, 2007   in   Cook   county, in the Northern

District of Illinois defendant,

knowingly used or caused another to use any facility of interstate or foreign commerce with the intent that
murder be committed in violation of the laws of the State of Illinois (720 ILCS 5/9-1) as consideration for
the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value,

in violation of Title _____ 18 _____ United States Code, Section ___ 1958 ___ .

I further state that I am a _Special Agent with the Federal Bureau of Investigation_ and that this complaint

is based on the following facts:

**FILED**

See attached affidavit.

SEP 2 5 2007

MICHAEL W. DOBBINS

Continued on the attached sheet and made a part hereof:  X  Yes     ___ No CLERK, U.S. DISTRICT COURT

Signature of Complainant

Sworn to before me and subscribed in my presence.

September 25, 2007                    at
Date                          10 ⁵⁷ lm

Chicago, Illinois
City and State

Jeffrey Cole, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

STATE OF ILLINOIS      )                          UNDER SEAL

COUNTY OF COOK         )
                       )


### AFFIDAVIT

I,    Tom Simon, after being duly sworn, state as follows:

1.    I am Special Agent (SA) of the Federal Bureau of
Investigation (FBI), United States Department of Justice, and have
been  assigned to the FBI's Chicago Field Division for my entire 12
year career. I am currently assigned to a public corruption squad
and previously have been assigned to squads investigating white
collar crime and terrorism.  As part of my official duties, I
investigate violations of federal criminal laws.  I have received
special training in the enforcement of the federal criminal laws,
including violent activity.  I have also been involved in various
types of electronic surveillance, in the debriefing of defendants,
witnesses, and informants, as well as others who have knowledge of
criminal activity, including acts of violence.

2.    The following information is based upon my personal
observations, knowledge and information I received from other law
enforcement officers and my review of documents and records, as well
as from a cooperating witness (CW-2) who has proven reliable and
provided information which has been independently corroborated, as
set forth in part herein, including through recorded conversations.
Partial transcriptions of these conversations are set forth herein
with my interpretations thereof based upon my experience and the

experience of other agents and information from CW-2, who is cooperating with the government in the hopes of receiving charging or sentencing consideration.

3.    This affidavit is being submitted for the purpose of establishing probable cause for the issuance of a complaint charging JEROME FINNIGAN ("FINNIGAN") with using and causing the use of a facility of interstate commerce, namely a cellular telephone, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay money, in violation of Title 18, United States Code, Section 1958.

4.    Because this affidavit is being submitted for the sole purpose of establishing probable cause for the issuance of a complaint charging FINNIGAN with use of interstate commerce facilities in the commission of a murder for hire, it does not contain all the information known to me concerning this investigation.

5.    Chicago Police Department records indicate that FINNIGAN is a Chicago Police Officer assigned to the Special Operations Section.

6.    Records of the Circuit Court of Cook County indicate that FINNIGAN, along with other Chicago Police Officers assigned to the Special Operation Section, has been charged with a number of felonies, including armed robbery, armed violence, home invasion and

2

kidnaping (the state cases), allegedly committed in their capacity as Chicago Police Officers.

7. Records of the Circuit Court of Cook County indicate that FINNIGAN is currently released on a $4 million bond pending trial in the state cases.

8. There is a federal investigation into the activities of the Special Operations Section.

9. Based upon discovery provided in the state cases, FINNIGAN was made aware that a now former Chicago Police Officer (hereinafter CW-1) will be a witness against FINNIGAN in the first of the state cases to proceed to trial. Based upon recorded conversations, FINNIGAN is aware that CW-1 is also a potential witness in any potential charges resulting from the federal investigation.

10. As set forth below, based upon information from another cooperating Chicago Police Officer (hereinafter CW-2) who is a codefendant of FINNIGAN in the state cases, and upon recordings of FINNIGAN, there is probable cause to believe that FINNIGAN has used his T Mobile cellular telephone to which is assigned telephone number (773) 704-2240 with the intent that CW-1 be murdered in return for money.

11. According to CW-2, when FINNIGAN and CW-2 were released from jail on bond in the state cases, FINNIGAN said that he felt like killing himself and also stated that if he had to go back to

3

jail, he would "take someone out." CW-2 understood FINNIGAN to mean that he would kill someone prior to going to jail.

12.    According to CW-2, after a court date in approximately July of 2007 on the state court charges, FINNIGAN came to CW-2'S residence and stated that he was going to "take care of" CW-1. CW-2 understood this to mean that FINNIGAN was making plans to have CW-1 killed.    FINNIGAN stated that CW-1 was a very important witness against him and CW-2, and if they could get rid of him, the case against them would weaken.    FINNIGAN also brought up the cooperation of another Chicago Police Officer( hereinafter CW-3), and speculated whether he could also hurt CW-3. FINNIGAN further told CW-2 that a relative knew two former "2-6" street gang members who would kill someone for $5,000. Using the term "paint job" as a code to refer to the murder of CW-2, FINNIGAN asked CW-2 for money to pay for the murder of CW-1.

13.    According to CW-2, he had a subsequent meeting with FINNIGAN at FINNIGAN'S residence at which a relative of FINNIGAN was present.    FINNIGAN assured CW-2 that it was "ok" and they were "taking care of it," which CW-2 understood to mean killing CW-1. FINNIGAN'S relative gave a thumbs up signal when FINNIGAN said this.

14.    According to CW-2, on another occasion, CW-2 asked FINNIGAN how the "2-6" gang members would kill CW-1. FINNIGAN said that he wished he had kept a silencer he had for a weapon. FINNIGAN

4

then showed CW-2 a photo he had of CW-1, which he cut from a larger
photo containing other members of their SOS team.  FINNIGAN said
that he was going to give the photo to the "2-6" gang members to
facilitate the murder of CW-1.

15.  According to CW-2, after a court date in August 2007,
FINNIGAN approached CW-2 outside the courthouse and informed him
that the "paint job" was "all taken care of."

16.  On September 18, 2007, while CW-2 was in the presence of
agents, FINNIGAN and CW-2 had telephone conversations in which
FINNIGAN used his cellular telephone to arrange a meeting with CW-2.

17.  On the evening of September 18, 2007, FINNIGAN and CW-2
met at FINNIGAN's house. During the course of the recorded
conversation, FINNIGAN explained that he was looking for a different
hitman who would be more professional than the gang members he had
originally intended to hire to kill CW-1.

FINNIGAN    I'm lookin' for better prices for painting.

CW-2        Come on, man.

FINNIGAN    I'm...I'm, that's the price I got and I just said no
            way.

CW-2        I was hoping for a couple (UI).

FINNIGAN    Dude, so was I.  How do you think I was...very
            disappointed about it.  Hey.  But, but that, you know
            what?  That was with no problems.  That was with, never
            come back, you'd never have to paint again.

18.  After FINNIGAN informed CW-2 that the cost of hiring a
hitman to murder CW-1 had increased, FINNIGAN explained that the

5

more expensive hitman would be less risky, but that he was still

looking for a hitman who would be more affordable:

CW-2        ..., how does it go, how does it go from...being...I
            mean, it, what are they fuckin' nuts?

FINNIGAN    Professional painters, dude.  They're professionals.

CW-2        Come on.

FINNIGAN    Nope.  Never come back.

CW-2        That's a bunch...that's a bunch of garbage.

FINNIGAN    Well I'm telling you what the guy said.

CW-2        (sighs)

FINNIGAN    He said that the house will not have to be painted
            for...eight years again.  He said that they're
            professionals and you'll never have a problem.  Never
            have any complaints, never have a problem.

    19.  At one point during the conversation, when CW-2

mistakenly understood FINNIGAN to mean that the original hitman

has raised his price from $5000, FINNIGAN again explained that he

had contacted another hitman, not the gang member associates of

his relative:

FINNIGAN    Hey, this a complete stranger.  This guy's a complete
            stranger.

CW-2        Oh, I thought...

FINNIGAN    No...

CW-2        ...oh.

FINNIGAN    ...complete stranger.  Uh-uh.

CW-2        Well then, when uh, then uh, I thought...

    (talking at the same time)

6

FINNIGAN    He, he's, he has painted, has done a lotta paint jobs, dude.

CW-2    Oh...

FINNIGAN    Complete stranger.

CW-2    ...see, I thought it was your, whatever (UI)...

FINNIGAN    No, no, no, no. No. Hey, that's... that's only his.

20.    FINNIGAN then told CW-2 that they could still hire the gang members as hitman, but that it would be risky to do so because they were not professional killers:

FINNIGAN    Yeah, well, you know what? Uh, that, that's still very, very fuckin' possible. The only problem is, that could come back, dude. That's what I'm worried about.

CW-2    Yeah. No, you...yeah, fuck that, bro.

FINNIGAN    What happens, we have a problem with the fucking crackling or somethin' and then, you know...complaints about it?

CW-2    Oh.

FINNIGAN    You know what I'm saying?

CW-2    Yeah.

FINNIGAN    Then we're fucked.

CW-2    Yeah, especially with uh...

FINNIGAN    Yeah, yeah.

CW-2    ...(UI) mister...yeah.

FINNIGAN    Yeah. Right? That's what I mean. And that's what I'm worried about. The other one was fucking, completely fuckin', no complaints about the work.

CW-2    Fuck.

FINNIGAN    This one is fuckin'...this one is, is risky.

7

CW-2       (sighs)

FINNIGAN   It's very cheap, but it's risky.

21. During the course of this conversation, FINNIGAN

encouraged CW-2 to try to find someone to kill CW-1:

FINNIGAN   Well, the thing is, if you, if you, if you know some
           painters that could take care of it, dude, that'd be
           great, because I said that one, when they, when I just
           heard that...I was like, I...

22. On September 21, 2007, while CW-2 was in the presence of

agents, FINNIGAN and CW-2 had a telephone conversation in which

FINNIGAN used the same cellular telephone used previously to arrange

a meeting with CW-2.

23. On the evening of September 21, 2007, FINNIGAN and CW-2

met in FINNIGAN'S car, a beige 2002 Nissan Altima, VIN --

1N4AL11D22C185176, Illinois License D81191, in a parking lot in the

vicinity of Harlem and Archer Avenues. During this recorded

conversation, CW-2 informed FINNIGAN that he had found someone to

kill CW-1 and needed the photograph of CW-1 that FINNIGAN

previously stated that he had.

CW-2       Hey uh, the uh, paint job.

FINNIGAN   Yeah.

CW-2       I, I need you to give me like...you have an address...

FINNIGAN   Yeah.

CW-2       ...for me, or a picture or somethin'?

FINNIGAN   Yeah, absolutely, dude.

CW-2       Okay.  Remember the picture you showed me that one

8

time?

FINNIGAN    Yeah.

CW-2    Okay, I need that, 'cause, I'm, I'm gonna take care of it.

FINNIGAN    That's...

CW-2    You don't even, I...

FINNIGAN    ...that's the good news?

24. FINNIGAN had the photograph of CW-1 with him and handed it to CW-2 wrapped in a page of a map which FINNIGAN had ripped out of a map book in FINNIGAN's car. FINNIGAN later expressed concern that CW-2 wipe the fingerprints off of the photograph of CW-1 and handle it carefully to avoid leaving additional prints on it:

FINNIGAN    I know, dude, I don't, I was gonna say, he don't fuck, I never have nothin'...Listen, can you do me a favor? This is here, on this.

CW-2    Oh, oh, oh, here wait, wait.

FINNIGAN    No.  I'm just, will you make sure you do that?  Take it and put it in somethin'.  Here.

CW-2    Give me, just give me it.

FINNIGAN    No.  Put it in...here, get, take this right here. [paper ripping sound]

CW-2    Then get rid of that.

FINNIGAN    Oh.

CW-2    'Cause I'm just sayin', I'm just sayin', dude.

FINNIGAN    Don't, don't get that, this.

CW-2    No, no, no.

9

FINNIGAN    Put it in a different piece of paper.  Make sure, hey,
            will you take a tissue?

CW-2        Yeah, I'll, I'll do it.

FINNIGAN    Please.  Uh, (UI) that.  But that's okay.  Here, yeah,
            you know why that's a good idea, just in case.

CW-2        I will, I will.

FINNIGAN    Hey, don't leave that uh, that uh, you know tweezers.

CW-2        Yeah.

FINNIGAN    Pair of tweezers.

CW-2        Okay.  Can you, is there any way you can (UI)?

FINNIGAN    Just do this.

CW-2        Is, is...

FINNIGAN    I'm not sayin', but you never know, they could be
            pointin' somethin' at us.  You know what I mean?

    25.  FINNIGAN then agreed to provide CW-2 with CW-1's new

address so that CW-2 could provide the address to the person who

would be paid to kill CW-1.  FINNIGAN explained that he had CW-1's

new address on an invitation in FINNIGAN's residence.

CW-2        Do you think there's a way you can get the uh, paint
            job address?

FINNIGAN    I got it, the new one.

CW-2        I need it, I need it.

FINNIGAN    Brand new one.

CW-2        Dude, that's all I need.

FINNIGAN    I got the brand new one.

CW-2        (LAUGHS) It's done.

10

FINNIGAN    Hey, the old one...

CW-2       It's done.

FINNIGAN    Hey, had the old one...

CW-2       Uh-huh.

FINNIGAN    ...and uh, moved.  And brought the new one, remember?
            He was movin'.  I got the brand new one.  You know why?
            Cocksucker sent me a card to his son's graduation
            party.

CW-2       What?

FINNIGAN    Yeah.

CW-2       Get the fuck outta here, dude.

FINNIGAN    Two years ago.  Johnny's graduation party.  He sent me
            the brand new address.  Oh, yeah, dude, I got the new
            address.

        26.    After FINNIGAN promised to give CW-1's address to CW-2 the

next day, he asked CW-2 for assurances that they would not get caught

for hiring someone to kill CW-1.

CW-2       I need to get that like ASAP, dude, ASAP.

FINNIGAN    [CW-2], tomorrow morning okay?

CW-2       That's fine.

FINNIGAN    But listen, [CW-2], I mean can I ask you somethin', dude?

CW-2       What?

FINNIGAN    It ain't gonna come back to haunt us, right?

CW-2       I don't wanna tell you too many details because...

FINNIGAN    I don't wanna know none of 'em.

CW-2       Right.

FINNIGAN    I don't wanna know none of 'em.

CW-2      No, no.

FINNIGAN  You know why?  Subconscious, dude.

     27.    After FINNIGAN discussed another cooperating police officer who could provide damaging testimony about them, FINNIGAN agreed to pay one-half the fee of the hitman that he believed CW-2 was going to hire to kill CW-1:

CW-2      As far as the money goes, dude.

FINNIGAN  Yeah.

CW-2      I mean I'm gonna take care of it, but if you wanna come up with half that's fine.

FINNIGAN  Oh, no doubt, dude.  Are you fuckin', hey, it benefits me too, [Cw-2].

CW-2      I know, dude.  I know.

FINNIGAN  Absolutely, dude.

CW-2      I mean, you fuckin', you really pissed me off when you came, when you said forty grand, I'm like what the fuck are you talkin' about?

FINNIGAN  [CW-2], because that's what the guy came to me with, dude.

CW-2      Ohh.

FINNIGAN  The other one, he told me.  He's comin' by the house tonight.  He told me it could still be done.

CW-2      Really?

FINNIGAN  Yeah, but the only thing is, [CW-2], if you think this other guy is better, dude, you should go with that.

CW-2      This is, this is done.  Like this is...

FINNIGAN  Well then you probably should go with that.  You know why, [CW-2], because this dude, hey, this dude is ...  this.

    28. In addition to agreeing to provide CW-2 with CW-1's current

address, FINNIGAN also provided CW-2 with a description of CW-1's

car, so that both this description and the address could be provided

to the individuals FINNIGAN believed were being hired to kill CW-1.

FINNIGAN    But hey, [CW-2], I'm gonna tell you right now, dude, that
            is huge.  Huge.

CW-2        I needed this and we're good.  And I need that.  I need
            that.

FINNIGAN    That's tomorrow.

CW-2        The address is...

FINNIGAN    Guaranteed that's tomorrow.

CW-2        You don't even know.

FINNIGAN    It's tomorrow.

CW-2        Because look, the guy wants to just make sure that he want
            to, you know...

FINNIGAN    [CW-2], [CW-2], don't have the plate, but we got a
            description of the car.

CW-2        Don't worry about that.

FINNIGAN    Remember, black...you know he still got it.

CW-2        Yeah.

FINNIGAN    He kept that other one forever.  Black fuckin' uh, Mercury
            Marquis.  Looks like a squad car.

CW-2        Yeah.

FINNIGAN    A four-door.

CW-2        Right.

FINNIGAN    I don't know the plate, but uh, he'll be able to find it,
            dude.

Illinois vehicle records indicate that the vehicle described by

13

FINNIGAN matches the model of a vehicle registered to CW-1.

29. After this meeting ended and CW-2 was driving away, CW-2 called FINNIGAN on FINNIGAN's cellular telephone and FINNIGAN agreed that CW-2 could come to FINNIGAN's house immediately, rather than the next day, to obtain CW-1's address. However, as indicated in the recorded conversation, when CW-2 arrived at FINNIGAN's residence, FINNIGAN's wife came out and warned them that she had observed who she believed were federal agents surveilling FINNIGAN's residence. FINNIGAN warned CW-2 to hide the photograph of CW-1. CW-2 did not stay in the area long enough to obtain CW-1's current address.

30. After FINNIGAN and CW-2 finished their meeting, agents recovered from CW-2 a photograph of CW-1 which had been cut out of a larger photograph and which was wrapped in a map page.

31. According to CW-2, on September 23, 2007, he received a cellular telephone call from FINNIGAN who told CW-2 that he was outside of CW-2's door and wanted to speak to CW-2. FINNIGAN entered CW-2's house and asked CW-2 to return the photograph of CW-1 which FINNIGAN had given CW-1 on September 21st. CW-2 falsely told FINNIGAN that he was nervous because of FINNIGAN's belief that federal authorities were watching them on September 21st and that, because of this fear, he burned the photograph of CW-1. FINNIGAN told CW-2 that he did not have another photograph of CW-1 not in a police uniform. FINNIGAN further told CW-2 that he followed the vehicle he saw near his residence on September 21st, and now believed it may not have

14

been federal agents.   FINNIGAN then asked CW-2 for a piece of paper and wrote the initials  of CW-1 and CW-3 on the paper.   While motioning to the initials CW-1 and CW-3, FINNIGAN discussed getting both CW-1 and CW-3 "taken care of." FINNIGAN also wrote the initials of two other Chicago Police Officers whom FINNIGAN correctly believed were also cooperating (hereinafter CW-4 and CW-5).  CW-2 asked FINNIGAN what he meant, and FINNIGAN told CW-2 that they might as well take care of all of the witnesses against them.

32.   I am aware that the cellular telephone used by FINNIGAN on September 18, 21 and 23, 2007, was operated on the network of service provider T Mobile.   Based upon the investigation and my training and experience, I am aware that T Mobile is an interstate provider of cellular communications, and that the telephone lines and equipment used by FINNIGAN to arrange the murder of CW-1 are themselves facilities of interstate commerce.   Moreover, the use of a facility of interstate commerce also does not require that any telephone call be used across state lines, but rather includes an intrastate telephone call, that is, a call within a single state, where the telephone lines or equipment used are themselves facilities of interstate commerce.

33. Based on the foregoing, I believe that the actions of JEROME FINNIGAN were in violation of Title 18, United States Code, Section 1958, in that he knowingly used or caused another to use any facility of interstate or foreign commerce with the intent that murder be committed in violation of the laws of the State of Illinois (720 ILCS 5/9-1) as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value.

FURTHER AFFIANT SAYETH NOT.

Tom Simon, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this
25th day of September, 2007

JEFFREY COLE
United States Magistrate Judge

16